ANDREW NUGENT *v.* CINCINNATI, HARRISON & INDIANAPOLIS STRAIGHT LINE RAILROAD CO.

(No. 4,617.)

1. A corporation will be affected by the fraudulent conduct of its agents, in like manner as if such agents had been acting for private employers.
2. To set aside an executed agreement, a case of actual fraud must be shown.
3. A party has no right, in his dealings with any other, to state a fact to be true which he does not know to be true, and which fact may influence the conduct of the other party. If such fact be stated, to obtain a benefit at the expense of the other party, and to his prejudice, and it appears there was no reasonable or probable ground for a belief in the existence of such fact, the inference is that there was no belief, and the statement under such circumstances, has the effect of, and may be properly treated as a fraud.
4. While a state of excitement in the public mind, upon a particular branch of public industry or improvement, might excuse exaggerated statements in matters of opinion, belief or judgment, it can form no legal or sufficient excuse for a departure from the truth as to facts, which are or should be, a matter of knowledge.

SPECIAL TERM.—This is an action to rescind an executed agreement, in pursuance of which the plaintiff on May 20, A. D. 1854, obtained from the defendant $2,820 in stock of the railroad company at par, and conveyed a tract of seventy and a half acres of land, valued at $40 for each acre. The defendant, at the time the agreement was made and executed, was an incorporated railroad company, under the general law of Ohio, acting by a president and directors.

Its organization commenced by a certificate signed on the 15th March, 1853. In that certificate, the name of the company and the termini of the proposed road are stated; and it is also stated that "the capital stock necessary to construct said road will be one million of dollars." The subsequent steps, up to the complete organization of the company, do not appear in the evidence in this case; and, particularly, it does not appear who were the original subscribers before the election of directors, or what amount of the capital stock was subscribed. There is evidence in the case that, at some period, after the organization of the company, the whole amount of cash subscriptions was only $26,000, and the amount of installments paid only $180. It appeared that the undertaking had been abandoned, and that the company is in the process of winding up.

*Strait & Hollister*, for plaintiff.

*Abram Brower & Wm. B. Caldwell*, for defendant.

GHOLSON, J. No question has been raised in this case as to the regular organization of the company, or as to the propriety of its receiving subscriptions of stock in real estate. But in view of the facts appearing in evidence, and to prevent any misconception from their being passed over in silence, I think it not improper to say, that the 9th section of the general act, under which the company was organized, requires ten per cent. of the capital stock to be subscribed before an election of the directors, and the 5th section makes ten per cent. of that payable at the time of subscription. I do not find in the act any authority to receive subscriptions in real estate, before the full organization of the company, by a meeting of the stockholders, and an election of directors. If there has been any irregularity in this respect, its effect need not be considered, as it has not been pressed, and perhaps could not be by the plaintiff. It is referred to, that it may not appear to be sanctioned. In forming these corpora-

tions, at least a fair and substantial compliance with the provisions of the statute should be observed.

The ground of relief relied on by the plaintiff is fraud. " Strictly speaking " it has been said, " a corporation can not itself be guilty of fraud. But where a corporation is formed for the purpose of carrying on a trading or other speculation for profit, such as constructing a railway, these objects can only be accomplished through the agency of. individuals; and there can be no doubt that if the agents employed, conduct themselves fraudulently, so that if they had been acting for private employers, the persons for whom they were acting would have been affected by their fraud; the same principles must prevail where the principal under whom the agent acts is a corporation." *Ranger* v. *Great Western R. R. Co.* 5 H. L. C. 86. The relief asked by the plaintiff can only be obtained by showing fraud—actual fraud. The agreement has been executed. The defendant has the title to the land and the plaintiff the possession of the certificates of the stock. In such a case it is not enough to show that untrue statements were made to the injury of the party, that they were material, and were relied on, but such statements must appear to have been made fraudulently. 6 Cl. & Finn. 338; I. H. L. Cas. 605–633. The party making them must be shown by direct proof to have had a fraudulent purpose in contemplation, or at least to have known that the statements were untrue. In the latter case it is not essential to see that there was a motive for actual fraud. " It is fraud in law if a party makes representations which he knows to be false and injury ensues, although the motive from which the representations proceeded may not have been bad; the person who makes such representations is reponsible for the consequences." 7 Bingh. 101, *Foster* v. *Charles.* Fraud must concur with the false statement, but if the party at the time the statement is made knows it to be false, that is enough to constitute fraud, and if damage ensues, there is a right to relief. *Polhill* v. *Walter*, 3 B. & Adol. 114; *Taylor* v. *Ashton*, 11 Mees. & Welsb. 401–415 ; *Collins* v.

*Evans*, 48 E. C. L. 820–827. Indeed it is not necessary to show that a party knew a fact represented to be untrue, if he stated a fact which was untrue for a fraudulent purpose, at the same time not believing that fact to be true, in such a case it would be both a legal and a moral fraud. 11 Mees. & Welsb. 415. A party has no right in his dealings with another to state a fact to be true, which he does not know to be true and which fact may influence the conduct of the other party. If such a fact be stated to obtain a benefit, at the expense of the other party and to his prejudice, and it appears there was no reasonable or probable ground for a belief in the existence of such fact, the inference is that there was no belief, and the statement under such circumstances has the effect of, and may be properly treated as, a fraud.

Supposing these principles to be correct, before proceeding to apply them to the evidence in this case, it is proper to make another remark. There are, in most dealings, and particularly in those of a like character with that to be examined in the present case, two kinds of representations or statements. One in reference to matters in their nature promissory, or resting in opinion, judgment or expectation, and the other in reference to facts as having actually occurred, or as really existing. In the efforts which might be expected, and which historically are known to be often made, to bring into life such undertakings as that which was the object of the incorporation of the defendant, representations of the former kind formed a prominent part. And it would require strong and direct proof of a fraudulent purpose, on the one side, if not a degree of weakness amounting to incapacity on the other, to found a ground for relief against an executed agreement, upon any general representations as to the completion and success of a railroad enterprise. But while a state of excitement, or even delusion, in the public mind, on a particular branch of public industry or improvement, may excuse exaggerated statements in matters of opinion, belief and judgment, I can not admit that it forms any legal or

sufficient excuse for a departure from the truth as to facts, which are, or should be, a matter of knowledge.

I have no knowledge of, and do not admit that any state of circumstances have existed in this country, in the form of a railroad excitement, that did excuse, or could excuse, the statement of a matter as an existing fact, which at the time was known to be untrue, or which the party did not believe to be true. Parties have no right to become deluded as to matters of fact, and carry any such delusion into their dealings with their fellow-men. They must be taken to intend the necessary consequence of their acts, or admit the invalidity of the whole transaction, for want of proper competency to act.

I come now to the questions of fact in this case, to the allegations of false and fraudulent representations, and the evidence by which they are sustained. I shall confine myself to two: one as to the amount of subscription which the company had obtained, and the other as to the fact that the road was under contract, with the exception of a small part. That such representations were made, and made in the strongest terms, is shown by the evidence of the plaintiff; that they were material, or calculated to induce action on his part, is clear from their nature, and by this I am to be governed, rather than by the declaration of the plaintiff in his evidence to that effect. The evidence, I think, clearly shows that both representations, and particularly the former, were untrue, and I am bound to conclude, from their nature, that their falsity must have been known to the agent of the defendant, by whom they were made. This, according to the principles to which I have referred, is fraud, actual fraud, such as would sustain an action for deceit, and sufficient to authorize the rescission of an executed agreement.

I have selected the two representations to which I have alluded, because, as to them, the evidence of the plaintiff is sustained and corroborated by the other evidence in the case. I am strongly impressed with the impropriety and danger of allowing parties to set aside solemn and executed agree-

ments upon their own unsupported evidence, which, from the circumstances, there is no opportunity to contradict, as in this case, where the agent, who is alleged to have made the false and fraudulent representations, has died, and the action has been since commenced. But as to the representation that a much larger subscription of stock had been obtained than the reality justified, the evidence of the plaintiff is, to a great degree, strengthened by the fact that an exaggerated statement to the same effect is found in the published circular or prospectus of the railroad company. As has been before observed, while errors of judgment, opinion, or belief in such papers may be excused, there is no excuse for a positive statement of anything as a fact which is untrue, and exact and accurate information as to which was in the power of the party making or authorizing the statement. In the circular, or prospectus, these statements occur: "A real estate subscription of $1,200,000 is secured; we want an additional subscription of $800,000, before we commence operations." "Our real estate subscription is fully worth what we allowed for it, and we shall continue to accept further subscriptions, if offered at fair prices." "Propositions for $400,000 of a subscription are now before us, of which we expect to accept about half. By the 1st of May ensuing, we think we shall have the subscription we require to commence operations." From the evidence of the plaintiff, it appears that, during the same month of May, to induce him to complete the agreement and execute the deed, the agent of the defendant stated that the company had procured nearly all the subscriptions they wanted, and his would be about the last they wanted, or would receive. And this agent was the acting secretary of the company.

In point of fact, it appears from the evidence of witnesses introduced by the defendant, that instead of $1,200,000, considered as an actually secured and completed subscription, there was not one-half that amount. There were two companies, one in Indiana and one in Ohio, which were expected

to unite; of the estimated $1,200,000, it is shown that $500,000 were allowed to the Ohio company. The subscriptions to the Ohio company, at a time after the publication of the circular, and shortly before the plaintiff executed a deed and received certificates of stock, were shown to be as follows: Amount of stock issued for real estate, $60,000. Propositions accepted, but the subscription not completed by obtaining title to land and issuing certificates, $140,000. Other propositions for $200,000, in part rejected, and in part under consideration. To this may be added the cash subscription of $20,000, on which installments to the amount of $180 had been paid; and still it can not be claimed that there was, in any just sense, a *secured subscription* of $500,000. As to the effect of such a misrepresentation, contained in an advertisement or circular, the remarks made in an analogous case are very pertinent. *Wontner* v. *Shairp*, 56 E. C. L. 440.

It is not denied that the favorable condition of the company, as having made contracts for the building of the road, was represented to the plaintiff. In the circular it is stated that "the bids we have accepted, under which we intend to get the road ready for the iron, are 20 per cent. below estimates of the engineer." There is, undoubtedly, evidence tending to show that there was a foundation in fact for this statement, and but for the evidence of the former president of the company, offered by the defendant, I am not prepared to say that a charge of fraud could be made out upon that statement alone. Taking his evidence as correct, the company are placed in this position: their agent and secretary, who must have known the actual facts, was holding out the idea that the road was under contract, when he knew that, from present and impending financial difficulties, the company not only was in no condition to complete contracts or act on bids accepted, but, to use the strong language of the president, were determined, so far as they might be bound, " to beg off or buy off."

Now, I must confess, that the statement of the president

in reference to that matter, bears, to my mind, the strong impress of truth. The proposals for contracts were made in the winter of 1853–4, when the prospects for almost any railroad enterprise were considered bright and flattering. In the spring of 1854, when the time for entering into the contracts had arrived, the shrewd speculator began to see indications of the approaching financial storm. The prospects of disposing of railroad bonds to meet cash contracts for the commencement of a new railroad enterprise, may well be supposed to have become quite gloomy. The company is shown to have had none, or very little cash. Under such circumstances, an anxiety to get rid of contracts would be quite natural, and when stated by an officer of the company to have existed, the statement justly demands credit.

I do not feel that it is necessary to go more into detail in this case, and without expressing any opinion upon the other charges which have been made the subject of inquiry, I come to the conclusion that the plaintiff is entitled to the relief he has asked, and judgment will be rendered in his favor.

*Decree for plaintiff.*